# In the United States Court of Federal Claims

**No. 95-790C**
**(Filed Dec. 14, 2006)**

| | |
|---|---|
| **MOLA DEVELOPMENT CORPORATION,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant.** | **Winstar - Statute of Limitations; 28 U.S.C. § 2501; Accrual of Cause of Action for Breach of Contract; Contract Formation; Fifth Amendment Taking; Due Process.** |

Paul R. Franke, III, Murray, Franke, et al., Denver, CO, for Plaintiff.

Sameer Yerawadekar, U.S. Department of Justice, Civil Division - Commercial Litigation Branch, Washington, D.C., for Defendant.

---

## OPINION

---

**Williams**, Judge.

This Winstar case comes before the Court on Defendant's Renewed Motion to Dismiss and the parties' Cross-Motions for Summary Judgment on Liability. The motions present two issues: whether the action is time-barred and whether a contract was formed.

Defendant contends that the statute of limitations began to run on July 31, 1989, when the regulators sent the bank a letter designating the institution as troubled and placing restrictions on its ability to increase assets or liabilities. The Court disagrees. Because FIRREA's restrictions did not apply to Plaintiff until December 7, 1989, when FIRREA's implementing regulations became effective, Plaintiff's claim accrued at this time, and its complaint of December 5, 1995, was timely filed. However, because the Government's approval of Plaintiff's acquisition of the failing thrift here did not give rise to a contract, Defendant's motion for summary judgment is granted.

## Background[1]

The circumstances surrounding the thrift crisis of the early 1980s and the ensuing enactment of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) have been extensively set forth in United States v. Winstar Corp., 518 U.S. 839 (1996) and its progeny. These circumstances are set out in brief below.

Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions (thrifts). This pattern threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation (FSLIC), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts. Winstar, 518 U.S. at 846-47.

To deal with this crisis, the Federal Home Loan Bank Board (FHLBB), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts to purchase insolvent thrifts in supervisory mergers, and permitted the acquiring institution to allocate any shortfall between liabilities and real assets to an intangible asset known as "supervisory goodwill."[2] Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1364 (Fed. Cir. 2004). The FHLBB allowed the merged bank to count supervisory goodwill toward its reserve capital requirements and to amortize the goodwill over an extended period of time, which frequently exceeded the life of the underlying asset. Winstar, 518. U.S. at 850-51. In addition, the FSLIC offered cash contributions in the form of capital credits that acquiring thrifts were permitted to count as permanent credits to regulatory capital and granted regulatory forbearances from enforcing a thrift's regulatory capital requirements for a specified period of time. Id. at 853.

Nonetheless, the crisis in the savings and loan industry continued, prompting Congress to enact the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) to prevent the collapse of the industry, attack the causes of the crisis, and restore public confidence. Winstar, 518 U.S. at 856. FIRREA abolished the FHLBB and the FSLIC, transferred thrift insurance activities to the Federal Deposit Insurance Corporation (FDIC), established the Office of Thrift

---

[1] This background is derived from appendices accompanying the parties' cross-motions for summary judgment.

[2] In 1981 and 1982, generally accepted accounting principles (GAAP) allowed two methods of accounting for mergers and acquisitions, either "purchase of assets" or "pooling of interest." Under the pooling method, "separate businesses are combined, and future operating results are based on the original amounts of the respective assets and liabilities." First Fed. Lincoln Bank v. United States, 54 Fed. Cl. 446, 448 n.4 (2002). The purchase method "revalues the assets and liabilities of the acquired entity from their original book value to their market value at the time of the acquisition." Id. At the time of these transactions, the purchase method of accounting permitted the acquiring institution to record on its books the excess of the acquired entity's liabilities over its assets on a marked-to-market basis as an intangible asset known as goodwill, or in a supervisory merger, supervisory goodwill.

Supervision (OTS) as the new thrift regulatory agency, mandated a minimum capital requirement for thrifts, and prohibited the use of supervisory goodwill. Id. In FIRREA's wake, many thrifts were unable to comply with regulatory capital requirements. Id. at 856-58.

**Mola Development Corporation**

Mola Development Corporation (MDC) was founded in Huntington Beach, California in 1976 as a real estate development company. Pl.'s Resp. App. (Pl. App.) 8. Frank J. Mola was the founder, president and chairman of MDC. Id. In 1984, MDC diversified its business lines by acquiring a controlling interest in Orange Coast Savings and Loan Association, a federally insured savings and loan. Pl. App. 9. Orange Coast Savings and Loan was a "substantial supervisory concern" when it was acquired by MDC. Id. After acquiring the thrift, MDC changed Orange Coast Savings and Loan's name to Charter Savings Bank (Charter) and, by March 31, 1988, had reversed its adverse operating trend. Id.

**The Merit Savings Bank Acquisition**

Merit Savings Bank (Merit) was a minority-owned financial institution founded in 1962 to serve the financial needs of the Japanese Community in Little Tokyo, Los Angeles. Pl. Resp. 7. In 1986, the FHLBB had concerns about Merit's financial viability and began to look for a healthy bank to merge with Merit . See Pl. App. 20, 23-25. Merit itself also looked for merger partners, but by December 1987, still had not found one, and the Federal Home Loan Bank of San Francisco (FHLBSF) proposed that Merit be placed on the FHLBB's bidding schedule to be sold in June 1988. Id. at 27.

Following its success with the Charter acquisition, in September 1987, MDC hired Kaplan, Smith & Associates (Kaplan Smith) to assist it in identifying a thrift to target for another potential acquisition. Pl. App. 29-32. MDC began working with R. Brian O'Donnell and Munjit Johal of Kaplan Smith, both of whom were former FHLBSF employees familiar with the FHLBB rules relating to supervisory acquisitions. Affidavit of Munjit Johal dated Aug. 14, 2003 (Johal Aff.) ¶¶ 8-9, 13-14, Pl. App. 2. Kaplan Smith identified Merit to MDC as a thrift in need of a merger. Johal Aff. ¶¶ 16-18, Pl. App. 3; Pl. App. 11-12. In late December 1987, MDC and Charter sent a Letter of Intent to Merit setting forth an agreement to have Merit merge into Charter and notified the FHLBB Supervisory Agent. Pl. App. 34. On January 15, 1988, MDC and Merit entered into an "Agreement and Plan of Merger" under which MDC agreed to purchase all the shares of Merit for a total price of $1,000,756.20. Pl. App. 11.

Shortly thereafter, on January 28, 1988, MDC met with the FHLBSF to discuss issues related to the merger. Pl. App. 78-82. According to Supervisory Analyst D. G. Kvartunas's minutes of that meeting, MDC, through Mr. O'Donnell, "asked if the merger [could] be viewed as a supervisory case." Pl. App. 79. These minutes continued:

> Mr. O'Donnell asked if the merger can be viewed as a supervisory case. MDC wants to get Merit classified as such because of the accounting and tax implications for Charter. Mr. Davis [of the FHLBSF] said we will pursue it as a supervisory case and will discuss it with the appropriate powers in San Francisco and the Bank Board. However, he pointed out that the kind of latitude we give will set a precedence (sic). Mr. Davis asked that the Charter team provide us with a list of what they want. At this point Mr. O'Donnell distributed the attached list of forbearances.[3]

Id. Through the acquisition of merit, MDC and Charter "expect[ed] to benefit from the economies of a larger institution and become a major player in the market." Id. As of that time, MDC had "already reviewed some of the Merit properties and [had] moved personnel from MDC to Charter to concentrate on loan workouts." Pl. App. 78. Mr. Mola had already authorized site plans for some of the projects and "wanted to start things before the application [was] approved." Id.

Also at this meeting, Mr. Mola said he wanted to contribute real property, the Charter Center, but the FHLBSF representatives expressed reluctance to allow MDC to contribute $8 million in noncash assets. Id. at 15, 79; Pl. Resp. 10. Mr. Mola responded that MDC could make a cash contribution if necessary. Pl. App. 79.

Representatives from the FHLBSF and MDC met again on February 3, 1988, and the FHLBSF reiterated that the noncash approach suggested by MDC "was not viable under the current policy." Pl. App. 81. Also in February 1988, Mr. Johal of Kaplan Smith contacted two representatives of the FHLBB and stated that MDC could not pursue the Merit merger unless the FHLBB characterized Merit as a supervisory acquisition and the FHLBB considered approving a noncash contribution to satisfy the capital requirements of the resulting institution. Johal Aff. ¶ 24, Pl. App. 4.

On April 19, 1988, MDC filed its Application H-(e)3 with the FHLBB to obtain regulatory approval of the acquisition of Merit. Pl. App. 6-13. MDC and Charter proposed to record the acquisition of Merit as a purchase transaction under generally accepted accounting principles ("GAAP"), with any resulting goodwill to be amortized according to GAAP. Pl. App. 12.

The H-(e)(3) Application included the following list of regulatory forbearances requested by MDC and Charter:

> 1. The assets acquired by Charter from Merit will be deemed to have been acquired in a merger instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered

---

[3] The referenced list is not attached to the minutes in Plaintiff's appendix and is not in the record.

by the Bank Board where classified assets or scheduled items are referred to as "assets acquired in a merger instituted for supervisory reasons," classified assets or scheduled items attributable to Merit shall not be deemed to be classified assets or scheduled items in determining whether Charter meets the requirements of such sections[4] following the Effective Date.

2. Section 563.13 (Regulatory Capital Requirement) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") provides in subsection (b)(7)(iii) for the possible exclusion or moderation of the combined assets, investments, base liabilities and increased liabilities of [Merit] by [Charter] in computing the regulatory capital requirements of this section provided the merger was instituted for supervisory reasons. Therefore, the [FSLIC] will forbear, for a period of five years following the date of the consummation of the merger ("Effective Date"), from exercising its authority, under Section 563.13 of the Insurance Regulations, for any failure of Charter to meet the regulatory capital requirements of Section 563.13 arising solely from (1) (a) any increase in the contingency component attributable to the assets of Merit existing as of the Effective Date, and, (b) any increase in the total liabilities, increased liabilities, or base liabilities of Charter as of the Effective Date by reason of Charter's assumption of Merit's liabilities; or (2) Charter's assumption of the regulatory capital deficiency of Merit as of the Effective Date.

3. For a period of five years following the Effective Date, the Board will waive or forbear from enforcement of the regulatory capital requirements as stated in Insurance Regulation 563.13 provided that the Board may lawfully waive or forbear with respect to such requirements, and provided further that failure to meet the requirements is due to (1) (a) operating losses on acquired assets; (b) capital losses sustained by Charter upon disposition of acquired assets; (c) acquired assets that are to become classifiable; and (d) the assumption of Merit's liabilities; or (2) assumption of Merit's regulatory capital deficiency as of the Effective Date.

---

[4] This refers to 12 C.F.R. § 545.74 (regarding the amount an institution may invest in service corporations), 12 C.F.R. § 546.2 (determining whether the resulting institution of a merger met the regulatory capital requirements under 12 C.F.R. § 563.13(b)), and 12 C.F.R. § 563.8 (concerning the required ratio of scheduled items to specified assets for outside borrowing).

> 4. For the purpose of calculating any holding company net worth maintenance requirements of Mola Development Corporation for Charter, the Board will exclude, for a period of five years, the asset and liability balances of Merit.
>
> 5. For a period of one year following the Effective Date, in determining whether a penalty shall be assessed against or paid by Charter pursuant to Section 523.12 (Deficiencies and Penalties) of the Rules and Regulations for the Federal Home Loan Bank System ("Bank System Regulations"), the liquidity requirements of Section 523.11 (Liquidity Requirements) of the Bank System Regulations as applied to Charter shall be reduced by (1) the amount of Merit's liquidity deficiencies existing at the Effective Date and (2) any aggregate net withdrawals (excess of withdrawals over cash savings received) from Merit's offices after the Effective Date.
>
> 6. Charter shall stipulate to the FSLIC in writing that unless prior written approval has been obtained from the Supervisory Agency with the concurrence of the Director of ORPOS, dividends paid by Charter in any fiscal year shall be limited to 50% of its net income for that fiscal year . . . provided that any dividends permitted under this limitation may be deferred and paid in a subsequent year, but in no event will dividends be paid that would reduce the net worth of the association below the level required by I.R. 563.13.

Def.'s Mot. To Dismiss, App. (Def. App.) 9-10.

The merger application requested that the transaction be characterized as a supervisory merger. The Accounting Procedures Section of the application provided:

> The Applicant [MDC] and Charter proposed to record the acquisition of Merit as a purchase transaction under generally accepted accounting principles (GAAP), Accounting Principle Board Opinion No. 16, and Statement of Financial Accounting Standards No. 72 ("FASB No. 72"). Push-down accounting will be applied as permitted by GAAP and FHLBB Memorandum R 55a. Accordingly, the assets and liabilities will be recorded at fair value at the date of acquisition. If the fair value of the liabilities assumed exceeds the fair value of the tangible and indentifiable intangible assets acquired (FASB No. 72 goodwill), that amount would be amortized to expense over a period no greater than the estimated remaining life of the long-

> term interest-bearing assets acquired. Amortization shall follow the guidance set forth in paragraph 5 of FASB No. 72. Any additional goodwill resulting from excess of purchase price over book value recognized in the acquisition is to be amortized in accordance with APB No. 17 over a period no greater than 25 years.

Pl. App. 12.

In late April 1988, the FHLBB completed a review worksheet of the H-(e)3 application and noted that 1) MDC intended to use purchase accounting for the acquisition, 2) goodwill would be included in the resulting institution's regulatory capital, and 3) the use of goodwill complied with the FHLBB's policy guidelines. Pl. App. 84.

On May 5, 1988, a representative of the FHLBSF held a telephonic conference with Jon Maddox, the President and CEO of MDC, and requested that an additional contribution of tangible capital be made. Pl. App. 85-86. On May 11, 1988, the FHLBSF advised Mr. Mola that the FHLBB would approve the merger if MDC contributed enough cash to the resulting institution to meet its minimum capital regulatory requirement. Pl. App. 86. On May 17, 1988, the President of Charter sent a letter to the FHLBSF confirming their May 11, 1988 agreement that the merger would be approved subject to MDC contributing sufficient cash to meet the minimum regulatory capital requirements. Pl. App. 88.

On May 18, 1988, Supervisory Agent Anthony M. Paula sent a letter to the FHLBB regarding MDC's application, noting that a considerable amount of goodwill would be created in the transaction and that "[because] Merit is a supervisory case, certain forbearances [could] be approved." Pl. App. 37-39. Agent Paula also noted that, notwithstanding the forbearances granted, "Charter shall maintain its required regulatory capital level exclusive of the noncash contribution." Id. at 38.

On May 19, 1988, the FHLBSF recommended that the merger be approved if MDC agreed to the following:

> 1. Mola [MDC] will contribute enough cash to bring the Regulatory Capital of the resulting institution to the required level without the noncash contribution or capital forbearances, whatever that sum is when the transaction is consummated. The calculation shall exclude Merit's scheduled items as of 09/30/87.
>
> 2. Charter will maintain capital at minimum required levels without the noncash contribution.
>
> 3. There will be no substitution of debt liability on the Charter Centre.

> 4. Cumulative capital improvements on Charter Centre shall not exceed $1 million dollars without the prior written consent of the Supervisory Agent.
>
> 5. The current net worth maintenance agreement will stay intact.
>
> 6. Mola [MDC] will guarantee cash flow of Charter Centre.

Pl. App. 86.

After these conditions were presented by the FHLBB on May 20, 1988, Mr. Mola proposed the following modifications:

> 2. Charter will maintain capital at minimum levels without the noncash contribution. For purposes of calculating the minimum requirements, such calculation shall exclude the following attributable to the acquisition of Merit: (a) operating losses or acquired assets; (b) capital losses sustained upon disposition of acquired assets; (c) acquired assets that are or become scheduled items; (d) the assumption of Merit's liabilities; and (e) scheduled items and or classified assets.
>
> 7. The acquisition is being instituted for supervisory purposes.

Pl. App. 86-87.

On May 23, 1988, the FHLBB informed Charter that the FHLBB would not accept the modifications proposed on May 20. On May 24, 1988, Charter advised the FHLBB that MDC had accepted the conditions of approval set out in the May 19, 1988 letter from the FHLBB, but wanted a statement that the acquisition was instituted for supervisory purposes "because of their use of net operating losses for tax purposes." Id. The FHLBB agreed to this request. Id.

On June 7, 1988, Supervisory Agent Paula sent a letter to the FHLBB's Office of General Counsel in which he, among other things, recommended that the Bank Board classify Merit as a supervisory case given its financial difficulties. Pl. App. 92-94. The letter noted that "none of the forbearances requested by the applicant (except the exclusion of Merit's September 30, 1987 Scheduled Items from the calculation of the minimum capital requirement) will be approved." Id. at 94.[5] Supervisory Agent Paula characterized MDC's reason for having Merit classified as a

---

[5] Agent Paula listed the requested forbearances which had not been approved:

> Mola has requested that certain forbearances be granted with respect to compliance with the resulting institution's regulatory capital

supervisory case as follows:

> Section 1730(q)(8) of the National Housing Act (the "Act") provides that the FSLIC may give consideration that a proposed acquisition will result in the loss or reduction of the tax benefits of an insured institution's net operating loss carryforwards under Section 382 of Title 26 if such net operating loss carryforwards result from the insured institution's acquisition of one or more insured institution under Section 1729(f) or 1730(m) of this Act or pursuant to acquisitions that are otherwise deemed to be supervisory cases by the FSLIC. In order to utilize such consideration by the FSLIC, the applicant has requested that Merit be deemed a supervisory case by the Bank Board and that the subject acquisition be considered as being instituted for supervisory purposes.

Pl. App. 94.

In a June 21, 1988 memorandum, Supervisory Agent Paula stated that "in order for Mola to utilize the benefits of a tax free reorganization and the net operating loss carryforwards of Merit, the Bank Board has deemed Merit a Supervisory Case for the purposes of this acquisition . . . ." Pl. App. 99. The memorandum also stated that MDC agreed to the conditions set out by the FHLBB. Id. at 99-103.

By letter dated June 24, 1988, the FHLBB approved MDC's H-(e)3 application subject to a number of conditions. The approval letter stated in pertinent part:

> Our understanding of the proposed transaction is as follows: Mola Development Corporation (Mola) shall purchase all of the issued and outstanding shares (126,678) of Merit for a total purchase price of $1,000,756.00 or $7.90 per share. The cash will be distributed to holders of Merit's common stock upon surrender by such shareholders of their certificates representing such shares. As of the closing, Merit stock certificates shall automatically, by operation of

---

> requirement, reduction of liquidity requirement, dividend limitation, and the regulatory net worth maintenance stipulation with the holding company. Furthermore, Mola has requested approval for liability growth in excess of the limitation set forth by Insurance Regulation 563.13-1, as well as for certain lease transactions and an agreement to utilize the expertise, knowledge and services of Mola to solve the real estate problems that would be acquired from Merit.

Pl. App. 92-93.

law, be cancelled. Mola will then merge the newly acquired entity into Charter. The regulatory capital of the resulting institution at the date of the acquisition of Merit will be approximately $10.9 million, or 2.0 percent of liabilities. In order to bring the regulatory capital of the resulting institution to the required level, Mola has elected to contribute real estate, the Charter Centre, that will result in regulatory capital of $19.6 million, or 4.0 percent of liabilities.

Pursuant to the authority delegated to the Principal Supervisory Agent by the Federal Home Loan Bank Board (the Bank Board) under Insurance Regulation Section 574.8, the application is hereby approved subject to the following conditions:

1. Mola will contribute, on the effective date of the acquisition, enough cash to bring the Regulatory Capital of the resulting institution to the level required by 563.13, excluding the noncash contribution of the Charter Centre or any capital forbearances, as of the date the acquisition is consummated. The calculation for the cash contribution shall exclude scheduled items of Merit as of September 30, 1987;

2. Within one week of the effective date of the acquisition, Charter will provide to the Supervisory Agent an explanation of the calculation of the cash contribution;

3. Charter will maintain capital at the minimum required level exclusive of the noncash contribution;

4. There will be no substitution of the debt liability on the Charter Centre;

5. Cumulative capital improvements on Charter Centre shall not exceed $1 million without the prior written consent of the Supervisory Agent;

6. The current net worth maintenance agreement dated August 15, 1984, between Mola and the Bank Board will stay intact;

7. Mola will provide a written guarantee to the Supervisory Agent, within 30 days of the effective date of the acquisition, that the holding company will reimburse the association for any cashflow deficiencies of the Charter Centre;

> 8. The resulting institution shall stipulate that unless prior written approval has been obtained . . . dividends paid by Charter in any fiscal year shall be limited to 50 percent of their net income for that fiscal year, . . . but in no event will dividends be paid that would reduce the net worth of the association below its fully phased in capital requirement;
>
> In addition, your request to increase the liabilities of Charter in excess of the limitation set forth in Insurance Regulation 563.13-1 is hereby approved. Furthermore, your request to allow Charter to utilize the consulting services of Mola in connection with the work out of problem assets acquired from Merit is hereby approved under the authority of Insurance Regulation Sections 584.3(a)(7) and 584.3(e).

Def. App. 11-13. The regulators did not enter into an assistance agreement, and the FHLBB did not issue any resolutions approving the acquisition.

The closing for the merger between Merit and MDC occurred on July 29, 1988, and MDC made a cash contribution of $2.5 million to bring the resulting institution into regulatory capital compliance. Pl. App. 4. The merger was classified as one instituted for supervisory purposes. Id. The merger was "unassisted" in that the Government did not provide a cash payment to support the acquisitions, and there was no assistance agreement.

**FIRREA**

FIRREA was enacted on August 9, 1989, in response to the savings and loan crisis. Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified in various sections of 12 U.S.C.) The provisions prescribed uniformly applicable capital standards for savings associations. 12 U.S.C. § 1464(t)(1)(A) (2000). These standards included maintaining "core capital in an amount not less than 3 percent of the savings association's total assets." § 1464(t)(2)(A). Core capital was defined to exclude "any unidentifiable intangible assets" such as goodwill. § 1464(t)(9)(A). FIRREA mandated that the newly-created Office of Thrift Supervision (OTS)[6] promulgate final regulations not later than 90 days after August 9, 1989, and that those regulations would become effective not later than 120 days after August 9, 1989. § 1464(t)(1)(D).

**Examination of Charter**

In April 1989, the FHLBB conducted a Regular Federal Examination of Charter. Prior examinations reflected that as a result of Charter's acquisition of Merit on July 29, 1988, "the association was left thinly capitalized with a large amount of goodwill on its books." Pl. App. 114.

---

[6] FIRREA replaced the FHLBB with the OTS which had the responsibility of regulating all federally insured savings associations. Pub. L. 101-73, § 101(6), 103 Stat. at 187.

The scope of the April 1989 Examination focused on the correction of past deficiencies, the "progress in merging the Operations of Charter and Merit" and "the future capital plans of the association." Pl. App. 114. In an internal memorandum prior to the examination, the FHLBB stated that "Charter's performance has been relatively flat and on average negative." Pl. App. 115. The FHLBB attributed the poor operating performance to "its acquisition of Merit . . . [and dependence] on high-cost liabilities." Id. The FHLBB also noted that prior to the examination Charter had "negative tangible capital of $513,000" due to the Merit acquisition which generated approximately $19 million in goodwill. Pl. App. 116. In a letter dated July 31, 1989, following up on the April 24, 1989 Report of Examination, the FHLBB designated Charter as a "troubled institution" stating in pertinent part:

> We have determined that Charter Savings Bank (Charter) is a troubled institution as defined in Office of Regulatory Activities Regulatory Bulletin 3a (RB3a).[7] As detailed in our Report of Examination as of April 24, 1989, this office has serious concerns regarding your institution's level of tangible capital, results of operations and effectiveness of management. RB3a generally restricts liability growth of troubled institutions to interest credited and funding of legally binding loan commitments and loans-in-process until such time as the institution has corrected the deficiencies which resulted in the determination that it is troubled.
>
> Upon review of Charter's business plan (the plan) submitted to this office on June 9, 1989, we have the following concerns:
>
> . . .
>
> (6) The plan does not adequately address capital restoration of the

---

[7] RB3a, issued on September 7, 1988, was entitled "Policy Statement on Growth for Insured Institutions" and mandated limiting the growth of institutions that were deemed "troubled." The bulletin defined troubled institutions as "those [institutions] with a MACRO rating of 4 or 5, institutions failing their minimum regulatory capital requirement, or institutions otherwise identified as troubled by supervisory personnel." The bulletin stated:

> All troubled institutions must submit and be subject to a capital restoration plan that, among other things, prohibits them from increasing their liabilities in excess of the amount of interest credited unless approved by the PSA [Primary Supervisory Agents]. PSAs may permit an institution's liability growth to exceed interest credited when required to fund existing legally binding loan commitments and loans-in-process.

Regulatory Bulletin 3a (September 7, 1988) (rescinded by RB 3a-1 on January 9, 1990).

institution. Beginning January 1, 1990, Charter will be required to meet a higher minimum capital requirement and will not be able to use the maturity matching credit to reduce its minimum capital requirement to below four percent of total liabilities. In the financial projections provided in the plan, Charter will not have regulatory capital of four percent of liabilities until fourth quarter 1990.

Furthermore, the plan should specifically address Charter's need for tangible capital. The Financial Institutions Reform, Recovery and Enforcement Act will require all insured institutions to have tangible capital of at least 1.5 percent of liabilities. For Charter, this will mean a cash infusion of approximately $11 million. This figure could increase if the appraisals ordered as the result of the recent examination indicate further downward adjustments to the properties in question. It is our opinion that Charter's need for tangible capital significantly affects the institution's business plans.

Accordingly, Charter is hereby instructed to file a revised business and capital restoration plan (the revised plan) with its Supervisory Agent that details how the institution will correct these problems as well as those contained in the Report of Examination, and which limits the institution's liability growth to the greater of either (1) the amount of interest credited or (2) the amount necessary to fund existing legally binding loan commitments and loans in progress. The revised plan should be . . . filed within 45 days of your receipt of this letter.

Until such time that Charter's revised plan has been approved in writing by the Supervisory Agent, Charter is instructed to comply with this letter. Effective immediately and until further notice, Charter is directed to ensure that an increase in assets or liabilities facilitates no purpose other than to:

(1) Maintain minimal regulatory liquidity;

(2) Fund normal operating expenses, interest on deposits, and other legally binding debt instruments;

(3) Protect the value of the institution's assets, provided that the institution obtains the prior written approval of the Supervisory Agent; and

(4) Honor legally binding loan commitments, provide that waiver

> of the loans-to-one-borrower regulation (if necessary), is obtained from the Supervisory Agent (a list of legally binding loan commitments existing as of the date of your receipt of this letter should be submitted with the revised plan).

Def. App. 19-21.

On August 21, 1989, Supervisory Agent Paula recommended that Charter be transferred to Special Surveillance in the FHLBB "in order to rehabilitate the institution and mitigate the risks to the insurance fund." Pl. App. 47. In his recommendation memorandum, Mr. Paula noted that after the acquisition of Merit, the goodwill Charter had anticipated "increased 74 percent during the first quarter following the acquisition" resulting in a decrease in tangible capital "from positive $2.7 million to a negative $5.0 million." Id. at 46. The memorandum stated that the Report of Examination in April 1989 assigned Charter a rating of "4" indicating "significant deficiencies in management compliance and capability, in the capital position of the institution, and in the results of operations." Id. According to the memorandum, as of June 30, 1989, the institution had negative tangible capital of $4,223,000, and "Frank J. Mola . . . indicated that he [was] aware of the imminent regulatory changes which will require Charter to have 1.5 percent tangible capital and will make the necessary cash infusion once the regulation has taken effect." Pl. App. 47. Supervisory Agent Paula further stated that "Charter may fail its minimum capital requirements by January 1, 1990." Id. The recommendation concluded that "the General Surveillance team will assist Special Surveillance in evaluating the adequacy of the response to the ROE, and the adequacy of the revised business and capital restoration plan requested in our RB3a letter to the institution on July 31, 1989." Pl. App. 48.

By letter dated September 14, 1989, Charter's Board of Directors responded to the July 31, 1989, objecting to OTS' classification of Charter as a "troubled" institution and stating:

> Although you have this Board's assurance that this Association will comply with the directives outlined in the July 31 letter until a revised business plan has been approved by Charter's Supervisory Agent, please be advised that this Board takes vigorous objection to the classification of Charter as 'troubled.'
>
> Your current assessment of Charter is based largely upon the tangible capital requirements established by the recently enacted [FIRREA]. At best, classification based upon Charter's current tangible capital position is premature, particularly given that Charter's level of intangible capital was essentially inherited, with your approval, as a result of the supervisory acquisition of Merit. You further cite as justification 'results of operation and effectiveness of management,' as described in the Report of Examination as of April 24, 1989.

> . . .
>
> We concede that responding to the new tangible capital requirement established by FIRREA will be a significant challenge but is one that must be faced by some 50% of the industry. We are currently in compliance. The matter of continued compliance has been under review for some time by this Board and the Association's parent. We are in the process of developing a comprehensive three-year business plan.

Pl. App. 56-57.

On October 23, 1989, Charter representatives Frank Mola, Chairman of the Board of MDC, Jon Maddox, President and CEO of MDC, and Vince Mola met with OTS representatives Tom H. Sharkey, Assistant Director, Agency Group, Special Surveillance, and Sandy F. Geluz, an OTS field manager. A contemporaneous memorandum prepared by Ms. Geluz states:

> The meeting was called by Mr. Sharkey to discuss the need for capital and to improve the relationship between the institution and OTS Staff.
>
> . . . .
>
> [Mr. Sharkey] pointed out [Charter's] current tangible capital is a deficit of $4.3 million; they need tangible capital of $5.7 million by December 7, 1989. Charter Savings also needs to have core capital of $11.5 million. Mr. Sharkey indicated that supervisory goodwill needs to be clarified because it is unclear if only FSLIC assisted acquisitions qualify. Frank Mola indicated that he would appreciate any credit that could be given, but he is prepared to make the necessary cash infusion. He stated that as soon as he is notified of the amount needed, he may need 60 days to come up with the funds.

Pl. App. 49.

**<u>Regulations Implementing FIRREA</u>**

On November 9, 1989, OTS sent another letter to the board of directors of Charter regarding FIRREA's capital requirements, stating:

> On November 7, the Office of Thrift Supervision issued new

> regulations governing the minimum capital standards that will apply to the thrift industry, effective December 7, 1989. These standards were adopted following the Notice of Proposed Rulemaking issued by the Federal Home Loan Bank Board on December 15, 1988, as modified in order to respond to public comments on that proposal and to conform with the requirements of the [FIRREA].
>
> These regulations required each thrift institution to hold capital at least sufficient to meet three requirements -- tangible capital, core capital (or the "leverage ration"), and risk-based capital. The statute and the implementing regulations require institutions that fail any one of these three standards to take certain actions. The purpose of this letter it to draw your attention to these actions.
>
> . . .
>
> Based on the data submitted in your Thrift Financial Report from June 30, 1989, we believe that Charter Savings Bank will fail one or more of the capital requirements imposed on December 7, 1989. If Charter Savings Bank has already submitted a capital restoration plan in accordance with RB-3a, you must submit a revised capital restoration plan . . . which indicates how Charter Savings Bank will meet its new capital requirement in accordance with FIRREA, or provide us with sufficient information to demonstrate that Charter Savings Bank meets the new standard.

Pl. App. 51-52.

Ronald E. Jackson, a member of the board of directors of Charter during 1989, testified that as of September 1989 "the regulators were not honoring their treatment of goodwill in the manner which we at Charter expected." Def. App. 32. Jon Maddox, Charter's president and CEO, testified that the OTS's July 31, 1989 letter impacted Charter's operations negatively as follows:

> Our inability to fund loans promptly without regulatory approval, our inability to make management decisions day-to-day without regulatory approval does impact day-to-day operations.

Def. App. 39-40. Mr. Maddox considered this significant. Id. at 40.

As of December 7, 1989, Charter was not permitted to utilize goodwill for purposes of calculating Charter's tangible capital, and Charter failed to meet its minimum capital requirements. Pl. App. 54. On June 15, 1990, Charter was seized by OTS and transferred to the Resolution Trust Company (RTC), also created by FIRREA, for liquidation. Pl. App. 22.

## Discussion

### Statute of Limitations

Plaintiff filed its Complaint in the instant matter on December 5, 1995, alleging:

> Through FIRREA and its implementing regulations, the Government abrogated and breached its commitment made to MDC when the FHLBB approved the Acquisition [merger of Merit into Charter] in that MDC was no longer permitted under FIRREA to fully record as capital the supervisory goodwill resulting from the Acquisition.

Compl. ¶ 5.[8] Defendant argues that Plaintiff's claim for breach of contract accrued on July 31, 1989 the date of a letter from the regulators placing restrictions on Charter, or on September 14, 1989, the date of Charter's reply to this letter.

Under the Tucker Act, any claim over which this Court has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The six-year statute of limitations is "a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006); see also MacLean v. United States, 454 F.3d 1334, 1336 (Fed. Cir. 2006) ("In the Court of Federal Claims, the statute of limitations is a jurisdictional requirement attached by Congress as a condition of the Government's waiver of sovereign immunity and, as such, must be strictly construed.") (internal quotation omitted).

"A claim first accrues for purposes of 28 U.S.C. § 2501 when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir.1998) (internal quotation omitted); see Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988) ("[A] cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.").

In breach of contract cases "a cause of action accrues when the breach occurs." Alder Terrace, 161 F.3d at 1377 (quoting Manufacturers Aircraft Ass'n v. United States, 77 Ct. Cl. 481, 523 (1933)). "Failure to perform a contractual duty when it is due is a breach of contract." Winstar

---

[8] The Complaint contains five counts: (1) Damages for breach of contract "not less than $20 million;" (2) restitution based on rescission of contract; (3) compensation for taking of property rights; (4) damages for deprivation of property without due process; and (5) damages for retroactive application of law in violation of due process. Compl. at 17-20.

Corp. v. United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996). In Winstar, the Supreme Court accepted the Federal Circuit's conclusion that "the Government breached [its] contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth." 518 U.S. at 870. In Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997), the Court of Federal Claims concluded that "FIRREA did not legally require plaintiffs to act in any certain way before the effective date of the regulations" and therefore found that the breach occurred on the effective date of the regulations, i.e., on December 7, 1995, not upon the passage of FIRREA. Thus, suits filed within six years of the effective date of the regulations were held to be timely. Id.[9]

In Bank of America, FSB v. United States, 51 Fed. Cl. 500, 506 (2002), the Court concluded that Plaintiffs in Winstar-Related Cases did not establish a bright-line rule that the date of FIRREA's implementing regulations triggered accrual of Winstar actions:

> We did not . . . rule out the possibility other actions taken by the government prior to December 7, 1989 could similarly trigger the statute of limitations. Indeed, the regulations were legally significant because '[o]nce [they] took effect, thrifts were legally subject to new capital standards that were in direct contradiction to the terms of their forbearance agreements . . . . At this point, the Government's breach of contract was actual and harm to plaintiffs was inherent and obvious.' It follows, therefore, that a government action which contradicted plaintiffs' forbearance agreements – for instance, one that interfered with their right to treat supervisory goodwill as capital – could likewise mark the claim's accrual. At the heart of our . . . inquiry, then, is a single question: when did [the thrift] first become subject to the restrictions imposed by FIRREA?

Bank of America, 51 Fed. Cl. at 506 (citations omitted).

The Bank of America Court went on to hold that the claim for the breach of the goodwill contract there accrued no later than October 6, 1989, the date of an OTS letter conditioning a second merger on meeting FIRREA's capital requirements. Id. at 510. That letter conditioned approval for the purchase on the infusion, by the plaintiffs, of "additional capital into [the institution] . . . in the

---

[9] Two other actions, filed after December 7, 1995, were dismissed as untimely, and both dismissals were affirmed by the Federal Circuit because the complaints had been filed more than six years after the regulations went into effect. Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 880 (Fed. Cir. 1998); Shane v. United States, 161 F.3d 723, 724 (Fed. Cir. 1998). In Ariadne, the Federal Circuit held that "[t]he government's liability was fixed when it refused to allow use of the asset as it had promised," but did not have reason to determine what the exact date of the breach was in that case. 133 F.3d at 879.

amount necessary for [the institution] to immediately meet the 1.5% tangible and 3% core capital requirements as promulgated under [FIRREA]." Id. at 504 (emphasis added, citations omitted). As the Court recognized, "the approval letter effectively accelerated the application of FIRREA." Id. at 510.

In the instant case, Defendant argues that either the July 31, 1989 letter from the FHLBB placing restrictions on Charter, or Charter's September 14, 1989 response effectively accelerated the application of FIRREA, thus triggering accrual of the cause of action. Specifically, Defendant argues that the July 31, 1989 letter placed restrictions on Charter's ability to increase assets or liabilities, suggesting that the FHLBB was accelerating application of FIRREA's tangible capital requirements to Charter, thereby breaching the alleged contract, and that Charter's September 14 response indicated Plaintiff's acknowledgment of such breach.

The Court disagrees. The July 31 letter was a follow-up to the FHLBB's April 24 regularly conducted examination of Charter. That examination resulted in Charter's designation as a "troubled bank" which triggered a host of salutary regulatory restrictions under a pre-existing Regulatory Bulletin, RB3a, -- including the very limitations on growth and increasing liabilities set forth in the July 31 letter. It was Charter's designation as a "troubled bank" which prompted regulatory review of Charter's business plan of June 9, 1989. It was in this context that the regulators required Charter to submit a revised business plan, taking into account the upcoming, future tangible capital requirements which would be imposed by FIRREA. To the extent the July 31 letter imposed an immediate harm on Charter, such harm was not due to an accelerated application of FIRREA -- the alleged breach claimed here. Rather, the harm resulting from the July 31 letter -- limitations on growth and restrictions on increases in assets or liabilities -- stemmed from Charter's poor operating performance reflected in the April Report of Examination. These limitations did not purport to be an acceleration of FIRREA, but interim restrictions applied under RB3a until Charter's revised business plan could be approved and "until such time as the institution has corrected the deficiencies which resulted in the determination that it is troubled." Def. App. 19-21.

Moreover, the July 31 letter recognized that FIRREA's impending restrictions were not currently being applied to Charter (RB3a's restrictions were) and that FIRREA's restrictions would be applied in the future. The July 31 letter stated that FIRREA's capital requirements "will require all insured institutions to have tangible capital of at least 1.5 percent of liabilities," and that "beginning January 1, 1990, Charter will be required to meet a higher minimum capital requirement to below four percent of total liabilities." Pl. App. 42-43. (emphasis added)[10]

Further, Charter's September 14, 1989 response did not trigger the statute of limitations governing its breach claim. While Charter's September 14 letter attempted to shift the blame for the problems identified in the April Examination from its own previous operating difficulties to future requirements emanating from FIRREA, that letter did not establish harm caused by FIRREA's requirements being applied immediately. Pl. App. 56-59. Rather, the September 14 letter

[10] The July 31, 1989 letter was written nine days before FIRREA was enacted.

acknowledges that any classification of it as troubled based on FIRREA would be "premature." Id. at 56. In its September 14, 1989 letter, Charter stated "We concede that responding to the new tangible capital requirements established by FIRREA "will be a significant challenge . . . . We are currently in compliance." Pl. App. 57 (emphasis added).

Numerous Government documents also demonstrate that FIRREA was not yet being applied to Plaintiff as of either July 31 or September 14, 1989:

- An internal FHLBB memorandum dated August 21, 1989, noted that 'Charter may fail its minimum capital requirement by January 1, 1990,' and that:

- Frank J. Mola, President of the holding company parent, and Chairman of the Board, has indicated that he is aware of the imminent regulatory changes which will require Charter to have 1.5 percent tangible capital and will make the necessary cash infusion once the regulation has taken effect.

- An internal FHLBB memorandum dated October 23, 1989 stated:

  > [Supervisory Agent Sharkey] pointed out [Charter's] current tangible capital is a deficit of $4.3 million; they need tangible capital of $5.7 million by December 7, 1989.

- A letter from the OTS to Charter dated November 9, 1989 stated:

  > On November 7, the Office of Thrift Supervision issued new regulations governing the minimum capital standards that will apply to the thrift industry, effective December 7, 1989.

Pl. App. at 47, 49 and 51 (emphasis added).[11]

As the Federal Circuit recognized in Ariadne, the Government's liability was fixed when it "refused to allow use of the asset as it had promised." Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998). It is clear that the RB3a restrictions as well as the July 31, 1989 letter designating Charter as troubled and imposing restrictions flowing from that designation did not operate to fix Defendant's alleged liability for "deliberately repudiating its

---

[11] In addition, a FDIC report of examination completed after FIRREA was enacted stated that "[Charter] is operating with insufficient capital and failed its minimum capital requirements on December 7, 1989." Pl. App. at 54 (emphasis added).

promise to allow MDC and Charter to include supervisory goodwill as regulatory capital." Compl. ¶ 38. Rather, the alleged breach claim did not accrue until December 7, 1989, when FIRREA was first applied to Charter and Charter could no longer count goodwill toward regulatory capital.

**Was There A Contract?**

**Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In making a determination as to whether summary judgment is appropriate, a court does not weigh the evidence to determine the truth of the matter, but rather assesses whether there is a genuine issue for trial. Id. at 249. The movant bears the initial burden of establishing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact finder to decide the case in its favor. Liberty Lobby, 477 U.S. at 256. If such evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50. When considering the existence of a genuine issue of material fact, a court must draw all inferences in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). If genuine disputes exist over material facts, both motions must be denied. Id.

Courts must act with caution in granting summary judgment, because though it is a useful procedural tool to speed the determination of disputes in which no questions of material fact exist, an erroneous grant of summary judgment may deny a party its chance to prove its case at trial. D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1146-47 (Fed. Cir. 1983). Likewise, an "improvident denial" of summary judgment may force the parties and the court to bear the expense of an unnecessary trial. Id.

**Contract Formation Principles**

In cases in which the Government contracts as a commercial party, courts are to apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." Winstar, 518 U.S. at 870-71. To form an agreement binding upon the Government, four elements must be met: (1) mutuality of intent to contract; (2)consideration; (3) lack of ambiguity in offer and acceptance; and (4) a government representative having actual authority to bind the United States in contract. D&N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003); see Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003); Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997).

As Senior Judge Smith observed in Cal. Fed. Bank v. United States, 39 Fed. Cl. 753, 773 (1997) ("CalFed I"), aff'd, 245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002), "[c]ontracts are not technical documents requiring forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in logical sequence. Thus, "[r]egulatory documents can be construed as contractual commitments where the reality of the transaction supports such a construction." Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 264, 274 (2002) ("Fifth Third I"). However, Plaintiff has the burden of proving that "the reality of the transaction favors construing such documents as contractual undertakings, as opposed to regulatory statements." Id. at 274-75.

**Mutuality of Intent to Contract - Lack of Ambiguity in Offer and Acceptance**

Unambiguous mutuality of intent to contract is a precondition for contract formation. Anderson, 344 F.3d at 1353; Fifth Third I, 52 Fed. Cl. at 270. In order to show that mutual intent existed, a plaintiff must provide objective evidence of an offer and a reciprocal acceptance. Anderson, 344 F.3d at 1353.

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Id.; Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement (Second) of contracts § 24): Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 742-43 (2003). "For a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" Anderson, 344 F.3d at 1355 (quoting Restatement § 50(1)).

It is well established that "[a]n agency's performance of its regulatory or sovereign functions does not create contractual obligations." D&N Bank v. United States, 331 F.3d at 1378-79; see Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1234 (Fed. Cir. 2005) ("[the] mere approval of a merger by FHLBB, acting solely in its regulatory capacity, did not create contractual obligations"). In D&N Bank, the Federal Circuit held that in the Winstar context, "something more" than mere regulatory approval of the merger was necessary to support a finding that the Government accepted an offer and entered into a contractually binding agreement. In Anderson, the Federal Circuit illuminated what "something more" might be, stating that it "must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.'" 344 F.3d at 1356 (quoting Restatement (Second) of Contracts § 50 cmt. a.).

Here, there was no offer requesting the regulators to permit MDC to continue to count supervisory goodwill toward capital in the face of potential regulatory change. Nor was there a request by MDC to amortize goodwill over an extended period. In Southtrust of Georgia, Inc. v. United States, the court held that because "the plaintiffs sought only the use of goodwill that the then-existing regulatory scheme allowed and did not seek or secure any protection for use of that goodwill for any period of years," a contract had not been formed. 54 Fed. Cl. 741, 746-47 (2002) (citing Cal. Fed., 245 F.3d at 1347). This is precisely the situation here.

In its application, Plaintiff did not seek any favorable accounting treatment of goodwill beyond that allowed by the then-existing regulations. Plaintiff's merger application requested only that the transaction be characterized as "supervisory." Neither the application nor any negotiations requested either an extended amortization of goodwill beyond that permitted by GAAP or an agreement that the current regulatory allowance for goodwill accounting would continue in the face of regulatory change. The application stated that MDC intended to account for the merger as a "purchase transaction under generally accepted accounting principles" then in effect, and to amortize any resulting goodwill over a period of no greater than 25 years. Pl. App. 12.

Moreover, the context in which MDC acquired Merit is telling. Unlike many Winstar scenarios, it was Plaintiff, not the Government, which initiated the acquisition of the failing thrift. Having once turned around a failing thrift -- Orange Coast Savings, which became Charter -- MDC hired Kaplan Smith to assist in targeting a thrift for another acquisition. Smith Kaplan identified Merit -- all without involvement of the regulators. MDC sent a letter of intent to Merit's Board, and MDC and Merit entered into an agreement and Plan of Merger under which MDC agreed to purchase all of Merit's shares for $1,000,756.20. Subsequently, MDC met with the regulators to discuss the merger, and the minutes reflect that MDC expected to benefit from the economics of a larger institution and wanted to "start things" before the application was approved. Against this backdrop, MDC submitted its Application for Merger to the FHLBB as required by the Savings and Loan Holding Company Act. There was no inducement from the regulators urging MDC to effect Charter's acquisition of Merit. Rather, MDC sought regulatory approval to have Charter acquire Merit and did not insist on the typical indicia of a Winstar contract -- such as the agreed-upon continued treatment of goodwill as regulatory capital and extended amortization. Moreover, the FHLBB granted Plaintiff less that it asked for and insisted on an additional infusion of actual capital before approving the merger.

Plaintiff contends that the classification of the merger as "supervisory" suffices to prove the Government's intent to contract. See Pl. Reply 13. However, simply labeling the merger as supervisory and allowing Plaintiff to use the purchase method of accounting does not prove the Government's intent to contract. In D&N Bank, the Federal Circuit held that no contract existed even when a merger had been labeled supervisory and the purchase method of accounting had been used. D&N Bank, 331 F.3d at 1379-80, (labeling of a merger as supervisory "would tell us nothing about the Government's intent to contract"); see also Palfed, Inc. v. United States, 61 Fed. Cl. 467, 468 (2004) (classifying a thrift merger as "supervisory" fails to demonstrate that the regulators intended to enter into a contract).

Similarly, in Anderson v. United States, the court found that the mere fact that a merger was "supervisory" and allowed for the use of goodwill as capital did not establish that a contract had been formed. 344 F.3d at 1356. In Anderson, the plaintiff in its application for supervisory conversion requested certain forbearances and use of the purchase method of accounting to amortize goodwill over a period of 40 years. Id. at 1347. However, during its subsequent negotiations, the plaintiff modified its offer by relenting on its demand for extended amortization of goodwill, and the FHLBB approved the application without mention of any forbearance or goodwill amortization. Id. at 1348.

In Anderson, the Federal Circuit determined that "the crucial governmental promise" in Winstar cases is the "extended amortization of goodwill." 344 F.3d at 1359. There, as here, that crucial promise was missing.

Plaintiff argues that a contract was formed because MDC requested supervisory goodwill pursuant to the Government's policies and procedures in Memorandum SP-37a which authorized the grant of an SM-2 forbearance. In general, an SM-2 forbearance allowed for deviation from GAAP and FASB 72 in the amortization of intangible assets such as goodwill. Sterling Savings v. United States, 57 Fed. Cl. 445, 448-49 (2003); see also, Coast Fed. Bank v. United States, 48 Fed. Cl. 402, 422 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) (en banc) ("SM-2 changes the amortization period for the goodwill from the FASB 72 requirement"). The stated purpose of Memorandum SP-37a was to "[e]xpedite the processing of supervisory or assisted mergers and acquisitions and to diminish the inordinate amount of staff time presently necessitated to negotiate the terms of forbearance letters with potential acquirers of institutions. . . ." Pl. App. 71. Memorandum SP-37a established three categories of potential forbearances: (i) standard forbearances that will be granted; (ii) forbearances that may be granted on a case-by-case basis if circumstances so justify; and (iii) forbearances that will not be granted. Pl. App. 72. Plaintiff contends it requested supervisory goodwill under the second category -- forbearances that may be granted on a case-by-case basis. See Pl. App. at 73.

The record establishes that Plaintiff did not request an SM-2 forbearance. This forbearance is not mentioned in Plaintiff's application or any of the documents concerning the acquisition. Rather, Plaintiff's application states:

> If the fair value of the liabilities assumed exceeds the fair value of the tangible and identifiable assets acquired (FASB No. 72 goodwill), that amount would be amortized to expense over a period no greater than the estimated remaining life of the long-term interest-bearing assets' acquired. Amortization shall follow the guidance set forth in paragraph 5 of FASB No. 72.

Pl. App. 12 (emphasis added). Plaintiff only sought to amortize the goodwill according to GAAP and FASB, and this is all the regulators granted, not the extended amortization provided by the SM-2 forbearance.[12]

---

[12] Further, as described in Memorandum SP-37a, an SM-2 forbearance would be reflected in forbearance letters containing the following language:

> For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by (resulting institution) over a period not to exceed ( ) years by the straight line method.

Plaintiff further contends that the negotiations leading up to the merger evince the Government's intent to contract. Tr. at 73. Plaintiff cites its back-and-forth correspondence with the regulators and FHLBB memoranda as evidence of the Government's intent to contract. However, the correspondence and memoranda do not mention continued use of goodwill in the face of regulatory change or extended amortization -- the crucial elements of a Winstar contract.

Finally, Plaintiff contends that the June 24, 1988 letter approving MDC's H-(e)3 Merger Application exhibited the Government's approval for the continuing use of goodwill because the Government knew that absent the use of goodwill the institution would have been insolvent immediately upon completion of the merger. According to the letter, without an additional capital contribution, the regulatory capital of the resulting institution would be only $10.9 million, or approximately 2% of liabilities. Pl. App. 60. In D&N Bank, the Federal Circuit rejected a similar argument and held that the FHLBB's approval of the merger alone "does not amount to intent to contract" even in light of testimony that it "made no sense for D&N to merge without a contract committing the Bank Board to allow D&N to count goodwill as an element of regulatory capital." 331 F.3d at 1378-79. The Court further noted that:

> D&N's arguments that it would have been 'irrational' or 'mad' for D&N to have acquired First Federal without insuring the right to treat goodwill as regulatory capital [would not] permit us to ignore the lack of proof of elements required to show the existence of a contract. Even if D&N would have been instantly insolvent and out of regulatory compliance were it not allowed to treat goodwill as regulatory capital, that fact tells us nothing about the government's intent [to contract].

D&N, 331 F.3d at 1380. Similarly, here, even if it would have made no sense for MDC to merge without a contract protecting its continued use of goodwill, the FHLBB's approval of such a merger alone does not demonstrate that a contract formed.

In sum, Plaintiff did not request and was not granted any forbearances which give rise to a contract in the Winstar setting. There is nothing in MDC's application or the history of negotiations asking for extended amortization of goodwill or the continued ability to count goodwill as capital in the face of regulatory change. The alleged negotiations and documents cited by Plaintiff show nothing more than regulatory approval of an acquisition. While the regulators did approve using goodwill as capital consistent with then existing regulations, they did not promise to permit MDC to continue this accounting in the face of regulatory change. As such, Plaintiff has failed to show

Pl. App. 74. Thus, Memorandum SP-37a assumed the use of forbearance letters in describing the grant of an SM-2 forbearance, and no forbearance letters were issued here.

the "something more" necessary to remove the transaction from the realm of regulatory approval.[13]

**The Fifth Amendment Claims**

Plaintiff alleges the passage of FIRREA and subsequent seizure of Charter for non-compliance with capital adequacy requirements amounts to a taking and a denial of due process in violation of the Fifth Amendment of the Constitution. In accordance with Federal Circuit precedent, both of Plaintiff's Fifth Amendment claims are dismissed.

In Castle v. United States, the Federal Circuit held that the enactment of FIRREA did not constitute an unconstitutional taking because the plaintiffs "retained the full range of remedies associated with any contractual property right they possessed." Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); see also Bailey v. United States, 341 F.3d 1342, 1346-47 (Fed. Cir. 2003); First Fed. Sav. and Loan Ass'n of Rochester v. United States, 58 Fed. Cl. 139, 166-67 (2003). After the Castle opinion was issued, this Court has routinely dismissed all Winstar-related takings claims. E.g., AG Route Seven Partnership v. United States, 57 Fed. Cl. 521, 535 (2003) ("case law is clear that Fifth Amendment taking claims are inapposite with contract claims when the government is a mere party to a contract and not acting as a sovereign . . . . "); First Fed. Sav. Bank of Hegewisch v. United States, 57 Fed. Cl. 316, 318-19 (2003) (finding Castle to be dispositive and dismissing plaintiff's takings claim); National Australia Bank v. United States, 55 Fed. Cl. 782, 789 (2003) (a takings claim is "conceptually foreclosed" by the finding of a breach of contract); Granite Mgmt. Corp. v. United States, 55 Fed. Cl. 164, 167 (2003) (holding that the plaintiff's "cause of action therefore is in contract, not takings law" and dismissing takings claim following an order to show cause).

Further, it is well-established that there is no jurisdiction under the Tucker Act over a Due Process claim "unless it constitutes an illegal exaction." Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1363 (Fed. Cir.2002), cert. denied, 538 U.S. 921 (2003) (citations omitted); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir.1997); AG Seven Partnership v. United States, 57 Fed. Cl. 521, 535 (2003); National Australia Bank, 55 Fed. Cl. at 789.

**Conclusion**

1. This action was timely filed, therefore, Defendant's Renewed Motion to Dismiss is **DENIED**.

2. Plaintiff's Cross Motion for Summary Judgment on Liability is **DENIED**, and Defendant's Motion for Summary Judgment on Liability is **GRANTED**.

---

[13] Defendant also argued that even if there was a contract, MDC was not a party to the contract because it was a shareholder of its thrift subsidiary and shareholder plaintiffs are neither direct parties nor third-party beneficiaries of such contracts. Because the Court concluded that there was no contract, it is unnecessary for the Court to reach this issue.

3. Plaintiff's Fifth Amendment Takings and Due Process claims are **DISMISSED**.

4. The Clerk is directed to dismiss this action. No Costs.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**