ORIGINAL

# United States Court of Appeals for the Federal Circuit

FILED
MAY 13 2008
U.S. COURT OF FEDERAL CLAIMS

2007-5058, -5080

MOLA DEVELOPMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

## Judgment

ON APPEAL from the United States Court of Federal Claims

in CASE NO(S). 95-CV-790

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

**AFFIRMED**

ENTERED BY ORDER OF THE COURT

DATED FEB 25 2008

Jan Horbaly, Clerk

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Date: 5/13/08

Issued as Mandate: MAY 13 2008
COSTS:
Printing ........................................ $691.76
Total........................................ $691.76

# United States Court of Appeals for the Federal Circuit

2007-5058, -5080

MOLA DEVELOPMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Paul R. Franke, III, Franke Greenhouse List & Lippitt LLP, of Denver, Colorado, argued for plaintiff-appellant.

Sameer P. Yerawadekar, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Mary Ellen Coster Williams

# United States Court of Appeals for the Federal Circuit

2007-5058, -5080

MOLA DEVELOPMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-790, Judge Mary Ellen Coster Williams.

---

DECIDED: February 25, 2008

---

Before NEWMAN, Circuit Judge, CLEVENGER, Senior Circuit Judge, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Circuit Judge NEWMAN concurs in part and dissents in part.

Dyk, Circuit Judge.

This is a Winstar breach of contract case. See United States v. Winstar Corp., 518 U.S. 839 (1996). Appellant Mola Development Corporation ("Mola") owned a controlling interest in Charter Savings Bank ("Charter"). Merit Savings Bank ("Merit") merged into Charter in 1988. After the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), the merged institution was seized and liquidated for failure to comply with FIRREA's regulatory capital requirements. Mola urges on appeal that a contract existed between Mola and the government with respect to the treatment of regulatory goodwill and that there was a taking. The government's cross-appeal asserts a statute

of limitations defense. Because we reject the government's limitations defense and conclude that there was no contract concerning the treatment of regulatory goodwill and no taking, we affirm the judgment of the Court of Federal Claims.

BACKGROUND

Mola entered the financial services business in 1984 by acquiring a controlling stake in a financially troubled savings and loan, Orange Coast Savings and Loan Association, which it renamed as Charter after the acquisition. After this successful merger, in 1987, Mola hired consultants to identify another troubled financial institution that could serve as a suitable merger partner for Charter. In 1986, the government expressed concern about the financial condition of Merit, and, on December 15, 1987, it proposed that Merit be placed on a bidding schedule for sale in June 1988. In November 1987, Mola's consultants selected Merit as the best merger partner for Charter, and in December 1987 Mola and Charter advised Merit's board of directors of Mola's interest in having Merit merge into Charter. Mola notified the government of the proposed transaction the next day. Mola and Merit entered into a formal agreement regarding the terms of a merger between Merit and Charter on January 15, 1988.

Thereafter, in early 1988, representatives of Mola and the government discussed the terms for regulatory approval of the proposed merger, which required authorization by the Federal Home Loan Bank Board ("FHLBB"). At these meetings, Mola requested that the government classify the merger as supervisory and that it allow Mola to make a non-cash contribution, rather than contributing cash, to bring the merged entity into compliance with capital requirements. Neither request was granted at that time, and

the government representatives indicated opposition to allowing Mola to fund the merged entity through a non-cash contribution.

Mola and Charter filed a formal application with the FHLBB seeking approval of the proposed merger between Charter and Merit on April 19, 1988. Among other provisions, the application provided for use of the purchase method of accounting and amortization of any resulting goodwill over a period not to exceed twenty-five years, provisions which were consistent with Generally Accepted Accounting Principles ("GAAP") and standard FHLBB policy at the time, and that required no regulatory forbearances. The merger application also included a list of six regulatory forbearances requested by Mola and Charter, none of which concerned the regulatory treatment of goodwill.

The government and Mola continued to disagree as to the level of cash contribution that would be required from Mola to complete the merger. On May 20, 1988, the government indicated that the merger would be approved only with a cash contribution sufficient to meet regulatory minimum capital levels. The government indicated that it would not accept any of Mola's six requested forbearances, and explicitly indicated that "Charter will maintain capital at minimum required levels without the non-cash contribution." J.A. at 200404. The government denied Mola's request for a new forbearance to exclude operating and capital losses and other liabilities assumed due to the acquisition of Merit from the calculation of the amount of cash required to bring the merged entity into regulatory compliance. Mola also requested that the merger be officially designated as supervisory, which as Mola indicated in a telephone

call to the FHLBB on May 24, 1988, it was seeking in order to facilitate "use of net operating losses for tax purposes." Id. at 200404-05.

On June 24, 1988, the FHLBB, by letter, gave preliminary approval for the merger between Charter and Merit, and the merger closed on July 29, 1988, although no formal resolution was adopted by the FHLBB to approve the merger. The government classified the merger as supervisory, as Mola had requested. An internal FHLBB memorandum noted that "in order for Mola to utilize the benefits of a tax free reorganization and the net operating loss carryforwards of Merit, the Bank Board has deemed Merit a Supervisory Case for the purposes of this acquisition, in a certificate dated June 24, 1988." Id. at 200411. The FHLBB's approval letter did not mention regulatory treatment of goodwill. The only regulatory forbearance mentioned in the approval letter stated that "[t]he calculation for the cash contribution shall exclude scheduled items of Merit as of September 30, 1987," id. at 200389, which allowed Mola to avoid counting certain of Merit's problem loans in calculating the cash contribution, allegedly for a two-year period. No document purports to be a written agreement between the FHLBB and either Mola or Charter. In particular, the government did not enter into any assistance agreement with Charter.

In the year after the merger, as a result of an FHLBB examination, Charter was designated as a "troubled institution" in a letter dated July 31, 1989. The FHLBB imposed restrictions on Charter's ability to increase its assets or liabilities. The letter also noted, in criticizing Charter's business plan, the probability that Charter would not be in compliance with stricter tangible capital requirements that would soon be imposed by legislation (that is, FIRREA).

FIRREA was enacted into law on August 9, 1989, and required the new Office of Thrift Supervision ("OTS") to promulgate implementing regulations within ninety days. OTS promulgated regulations that became effective on December 7, 1989. See Regulatory Capital, 54 Fed. Reg. 46,845 (Nov. 8, 1989). Charter was not in capital compliance under the new regulations when they became effective and, as a result, was seized by OTS on June 15, 1990, and subsequently liquidated.

Mola initiated this action in the Court of Federal Claims on December 5, 1995, urging that the implementation of FIRREA breached a contract between Mola and the government and that the government had also taken Mola's property when it retained a "surplus" resulting from the liquidation of Charter. The Court of Federal Claims denied a motion by the government to dismiss based on statute of limitation grounds, but granted summary judgment in favor of the government on the merits, finding that there was no contract relating to the treatment of goodwill and that there had been no taking. Mola Dev. Corp. v. United States, 74 Fed. Cl. 528, 541-42, 545-46 (2006). Mola appeals the judgment on the merits, and the government cross-appeals, challenging the denial of its motion to dismiss on statute of limitation grounds. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3), and review the decisions of the Court of Federal Claims on the motion to dismiss and summary judgment motion without deference. Guardian Indus. Corp. v. United States, 477 F.3d 1368, 1370 (Fed. Cir. 2007).

## DISCUSSION

### I

Claims against the government under the Tucker Act are subject to a six-year statute of limitations.[1] 28 U.S.C. § 2501. The government argues that the statute of limitations began to run when FIRREA was enacted, on August 9, 1989, and that the claims here were untimely because they were filed more than six years later, on December 5, 1995. This position was rejected in our recent decision in Bank of America, FSB v. Doumani, 495 F.3d 1366 (Fed. Cir. 2007). There we approved the reasoning of the Court of Federal Claims in Bank of America, FSB v. United States, 51 Fed. Cl. 500, 506 (2002), that the mere passage of FIRREA on August 9, 1989, did not trigger the limitations period for Winstar claims. Bank of Am., 495 F.3d at 1372.[2] We are bound by this holding in Bank of America, and we therefore reject the government's argument. Mola's cause of action did not accrue on the date of the passage of FIRREA.

Alternatively, the government urges that the Court of Federal Claims erred in holding that the limitations period did not begin to run until after FIRREA's implementing regulations became effective, on December 7, 1989.[3] The government urges that the statute of limitations can begin to run before FIRREA's implementing regulations were

---

[1] The Supreme recently held that this limitations period is jurisdictional. John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750 (2008).

[2] See also id. at 1375 (Mayer, J.. dissenting) (dissenting based on the view that "the August 9, 1989, enactment of [FIRREA] caused Bank of America[]'s claim to accrue").

[3] This court has held that claims filed more than six years after the December 7, 1989, effective date of FIRREA's implementing regulations are untimely. See Shane v. United States, 161 F.3d 723, 724 (Fed. Cir. 1998); Ariadne Fin. Servs.

adopted, and that the statute of limitations in this case did begin to run before the regulations were adopted.

The government is correct that the statute of limitations can begin to run before the adoption of FIRREA's implementing regulations. The Bank of America court, approving the Court of Federal Claims' reasoning, clarified that "activity before FIRREA's effective date can indeed start the clock" as to the limitations period. Bank of Am., 495 F.3d at 1372. However, it also approved the Court of Federal Claims' reasoning in that case, 51 Fed. Cl. at 506-09, that some of the government's actions in that case did not trigger the running of the limitations period. There the government had argued that the triggering actions were an August 31, 1989, regulatory bulletin requiring all thrifts to plan for the implementation of FIRREA and a letter, also dated August 31, 1989, indicating the government's intent to delay approval of a merger based on FIRREA. We held that these actions were insufficient to initiate the limitations period because they "did not contain a requirement for [the thrift] to take specific action contrary to its existing contract." Bank of Am., 495 F.3d at 1372. The Bank of America court also approved the Court of Federal Claims' reasoning that a subsequent October 6, 1989, letter that approved the delayed merger on the condition of full compliance with FIRREA's capital requirements, 51 Fed. Cl. at 510, did initiate the limitations period as to Bank of America's claim because the condition of compliance with FIRREA was necessarily inconsistent with the alleged contract. Bank of Am., 495 F.3d at 1372 ("[T]he earliest letter sufficient to cause a breach carried the

---

Pty. Ltd. v. United States, 133 F.3d 874, 880 (Fed. Cir. 1998). Mola's claim was filed less than six years after this date.

date of 6 October 1989."). That letter, however, was sent within the six-year limitations period.

The government here asserts that its July 31, 1989, letter, which designated Charter as a troubled institution and imposed immediate restrictions on Charter, initiated the limitations period for Mola's claim. The Court of Federal Claims rejected this argument, finding:

> To the extent the July 31 letter imposed an immediate harm on Charter, such harm was not due to an accelerated application of FIRREA . . . . Rather, the harm resulting from the July 31 letter – limitations on growth and restrictions on increases in assets or liabilities – stemmed from Charter's poor operating performance reflected in the April Report of Examination. These limitations did not purport to be an acceleration of FIRREA . . . .

Mola Dev. Corp., 74 Fed. Cl. at 541. This finding was not clearly erroneous. Thus, although the July 31 letter imposed immediate restrictions on Charter, these restrictions related to ongoing concerns about Charter's management, operating margins, level of tangible capital, and business plan and were not based on the impending enactment of FIRREA.

Because we agree with the Court of Federal Claims' finding that the July 31, 1989, letter did not trigger the running of the statute of limitations, we fail to see how Charter's September 14, 1989, response to the government's letter, suggesting that the government's position was inconsistent with the terms negotiated at the time of the merger, could be sufficient to trigger the initiation of the limitations period. While it is clear that Charter was concerned that as a result of FIRREA the government would not continue to allow goodwill as an aspect of regulatory capital, the government had not yet taken any action in this regard. Moreover, Charter reiterated in its September 14,

1989, letter that, in the absence of implementing regulations, it was not yet required to comply with the new FIRREA capital requirements. Although Charter's September 14 letter suggested that the action taken in the government's July 31 letter resulted from a premature application of FIRREA, Charter's erroneous assertion that this was the basis for the government's action does not change the fact that the government's action was not based on FIRREA. Rather, as the Court of Federal Claims found, Charter's attempt in the September 14 letter, "to shift the blame for the problems identified in the April Examination from its own previous operating difficulties to future requirements emanating from FIRREA" did nothing to alter the fact that the government had not yet implemented FIRREA's restrictions on regulatory use of supervisory goodwill, either generally or with respect to Charter. Id. at 541.

Under these circumstances, the statute of limitations was not triggered until the FIRREA implementing regulations became effective on December 7, 1989. Since this action was filed less than six years later, the statute of limitations does not bar the claim.

II

Mola urges that the Court of Federal Claims erroneously granted summary judgment as to its takings claim. "In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Mola does not argue, as have previous Winstar plaintiffs, that the government took a contractual right to particular regulatory treatment of goodwill. **[Bl.Br. 27]** Indeed, this theory has been soundly rejected. See Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002) (establishing a broad rule that the breach of any

contractual rights regarding regulatory treatment of goodwill does "not constitute a taking of the contract" so long as "the plaintiff[] retain[s] the full range of remedies associated with any contractual property right [it] possessed"); accord Bailey v. United States, 341 F.3d 1342, 1347 (Fed. Cir. 2003). We have also established that the seizure of an insolvent bank for liquidation does not constitute a taking. See Bailey, 341 F.3d at 1347 ("[I]t is well established that it is not a taking for the government to close an insolvent bank and appoint a receiver." (quoting Branch, 69 F.3d at 1575)).

Mola appears to argue that even if Charter was insolvent at the time it was seized by government regulators, there ultimately was a "$6,232,301.00 surplus net income from the liquidation of Charter," that this alleged surplus belonged to Mola, and that it was taken by the government. Appellant's Br. at 27. We have recognized that if a surplus were to exist after the liquidation of a seized institution and the satisfaction of all of the institution's liabilities, the institution's prior owners would have a property interest in such a surplus. See Bailey, 341 F.3d at 1347. Mola, however, has identified no evidence of a surplus of Charter's assets over its liabilities. The $6,232,301 figure Mola cites appears on a profit and loss statement, and indicates income during the liquidation in that amount. However, the receiver's statement of assets and liabilities states that at the time of its seizure Charter's liabilities exceeded its assets by more than sixteen million dollars. Mola has failed to establish any surplus that was taken by the government.[4]

---

[4] As Mola notes, the Federal Deposit Insurance Corporation ("FDIC") withdrew from the litigation because it concluded that it had little prospect of recovery on behalf of Charter's creditors. See, e.g., Landmark Land Co. v.FDIC, 256 F.3d 1365, 1382 (Fed. Cir. 2001) ("[W]here the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy

III

Mola also challenges the entry of summary judgment in favor of the government as to its breach of contract claim, arguing that there was a contract relating to regulatory treatment of goodwill, which was breached by the implementation of FIRREA. "In order to prevail in a Winstar case a plaintiff . . . must establish that a contract existed with the government whereby the government was 'contractually bound to recognize the supervisory goodwill and [particular] amortization periods.'" Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1365 (Fed. Cir. 2005) (quoting Winstar Corp. v. United States, 64 F.3d 1531, 1541-42 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996)). To prove the existence of a Winstar contract, like any other contract with the government, "four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003).

This court has previously explained the type of evidence needed to prove the government's intent to enter into a Winstar contract. We have emphasized that "regulatory proclamations are insufficient to create contractual obligations because . . . '[m]ere approval of the merger does not amount to [an] intent to contract.'" Id. at 1357 (quoting D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003)). "An agency's performance of its regulatory or sovereign functions does not create contractual obligations." D & N Bank, 331 F.3d at 1378-79; see also Cain v. United

---

requirement is not satisfied."). The FDIC's decision to voluntarily dismiss its claims does not amount to a concession that any excess recovery belongs to Mola, rather than the government, as Mola asserts.

States, 350 F.3d 1309, 1315-16 (Fed. Cir. 2003). Rather, "there must . . . be a clear indication of intent to contract and the other requirements for concluding that a contract was formed." D & N Bank, 331 F.3d at 1378. A plaintiff must provide "something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." Id. at 1377. In other words, "something more" than mere regulatory approval of the merger must be shown. See id. at 1379-80.

At the same time, we have recognized that a formal written agreement is not necessary to prove the existence of a Winstar contract when there is other adequate evidence of the government's intent to form a contract. See Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1231-32 (Fed. Cir. 2005). In Fifth Third, we held that, even in the absence of any formal document purporting to be an agreement between the institution and the government, the documentary evidence, including a merger application, an FHLBB resolution, and a letter recommending conditional approval of the merger, constituted an agreement as to the treatment of goodwill because an explicit agreement for the treatment of goodwill had been negotiated with respect to each of four consecutive mergers. Id.

Mola here points to no evidence of any negotiations about the regulatory treatment of goodwill that could serve as evidence that the government agreed to a goodwill contract.[5] Instead, Mola argues that its negotiation for the FHLBB's designation of the merger as "supervisory" is sufficient evidence of the government's intent to form a contract with respect to regulatory treatment of goodwill. This court

---

[5] The dissent, Diss. Op. at 7, urges that there were such negotiations, but this is entirely premised on the existence of negotiations over the supervisory

rejected a similar argument in D & N Bank, explaining that "labeling a merger 'supervisory,' alone, . . . tell[s] us nothing about the government's intent to contract." 331 F.3d at 1380. Mola nonetheless asserts that the negotiation over the supervisory designation was in effect a negotiation over the treatment of goodwill because such a designation was necessary, under the prevailing regulations, to allow use of the purchase method of accounting, the only accounting method that would recognize goodwill as an asset for regulatory purposes. We disagree with Mola's construction of the regulations, and thus need not decide the question of whether Mola could prevail under a contrary construction.[6]

The regulations themselves do not address the purchase method of accounting, though the regulations do set forth the standards for regulatory compliance. Section 563.13(b)(7)(i) provided that, "after any merger, consolidation, or purchase of assets and assumption of liabilities . . . the regulatory capital requirement of the continuing institution is computed . . . based on the combined assets, investments, base liabilities, and increased liabilities of the merged and continuing institutions." 12 C.F.R. § 563.13(b)(7)(i) (1988) (emphasis added).

---

designation which, as we discuss, did not concern use of the purchase method or goodwill.

[6] Mola's present argument in this regard rests on the affidavit of Munjit Johal, a former official of at the Federal Home Loan Bank of San Francisco and a consultant to Mola at the time of the merger. This affidavit suggests that a supervisory designation was required, pursuant to 12 C.F.R. § 563.13(7)(I)&(III) (1988), to use the purchase method of accounting in a merger to create goodwill as a book asset. Because the proper interpretation of these regulations is an issue of law, expert testimony relating to this question, such as the affidavit of a former government official, "should not be received, much less considered." Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369 (Fed. Cir. 2003). We therefore afford no weight to this affidavit in construing the regulations. Instead, we look to the regulations themselves and related documents to interpret the regulatory requirements.

The purchase method of accounting is addressed in detail in the FHLBB's internal Memorandum SP-24 (December 29, 1981). That memorandum provides for two different methods of accounting when a merger or purchase of assets occurs: the pooling method, which aggregates the assets and liabilities of the merging entities, and the purchase method, which calculates combined assets as if the dominant entity purchased the acquired entity by assuming its liabilities. Mola is correct that of the two available methods of accounting, only the purchase method, and not the pooling of assets method, allowed goodwill to be recognized as an asset of the merged entity.

Memorandum SP-24 provides that regulators would consider the economic reality of the combination in order to determine which accounting method to allow, and the purchase method of accounting was allowed, among other situations, when "[o]ne association with financial strength or significant size acquires or bails out small or weaker associations." J.A. at 200788. Nothing in Memorandum SP-24 suggests that whether the merger has been designated as supervisory is even relevant, let alone determinative, of the availability of the purchase method of accounting.

Mola correctly points out that 12 C.F.R. § 563.13(b)(7)(iii) provided that "the provisions of this paragraph (b)(7) of this section may be superseded" by FHLBB, if it determined that a "consolidation, merger, or purchase of assets and assumption of liabilities . . . is instituted for supervisory purposes." In other words, the regulation allowed the FHLBB to grant regulatory forbearances, as to the requirements of section 563(b)(7)(i) discussed above, in the case of supervisory mergers and to suspend

otherwise-applicable regulatory capital requirements. There is no showing in this case that any forbearances provided for the treatment of goodwill.[7]

Thus, the regulations and memorandum do not support Mola's assertion that the supervisory designation was necessary to utilize the purchase method of accounting. The use of the purchase method of accounting in this case was consistent with Memorandum SP-24 and GAAP and did not require forbearances or the designation of the merger as supervisory.[8]

Mola also argues that the government must have intended to form a contract with respect to regulatory treatment of goodwill because Charter would not have had sufficient capital to meet regulatory requirements absent the inclusion of goodwill in its regulatory capital calculation. This court has already rejected this argument in D & N Bank. While imminent regulatory noncompliance may help to establish that negotiated forbearances were contractual, see Fifth Third, 402 F.3d at 1232-33, the mere risk of regulatory noncompliance absent use of the purchase method of accounting does nothing to establish the existence of a goodwill contract, D & N Bank, 331 F.3d at 1380.

---

[7] The FHLBB's practice of granting forbearances as to mergers designated as supervisory was routinized to some extent by Memorandum SP-37a, which "established three categories of potential forbearances: (i) standard forbearances that will be granted; (ii) forbearances that may be granted on a case-by-case basis if circumstances so justify; and (iii) forbearances that will not be granted." Mola Dev. Corp., 74 Fed. Cl. at 544. The Court of Federal Claims found that Mola and Charter had not requested any forbearance relating to regulatory treatment of goodwill under Memorandum SP-37a.

[8] FIRREA used the new term "supervisory goodwill" to mean "goodwill resulting from the . . . combination of any savings association where the market value of the assets acquired was less than the market value of the liabilities at the time of the transaction and where the accounting treatment of the goodwill has been approved by the [FHLBB]." H.R. Rep. No. 101-54(I), at 432 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 228. The use of this definition in FIRREA does not suggest that prior to FIRREA

In the absence of other evidence indicating the government's intent to contract, the mere fact that the government approved a merger that, without inclusion of goodwill in Charter's regulatory capital calculation, would have left Charter's capital level below the regulatory minimum does not establish any contract to maintain this treatment of goodwill. See id. at 1380 ("Even if D & N would have been instantly insolvent and out of regulatory compliance were it not allowed to treat goodwill as regulatory capital, that fact tells us nothing about the government's intent.").[9]

Finally, Mola argues that it was granted a two-year forbearance with respect to the regulatory treatment of certain of Merit's problem loans, that this forbearance was contractual, and that the government breached this contract. As the government points out, whether or not there was such an agreement with respect to any forbearances regarding certain of Merit's problem loans, Mola has failed to demonstrate that such a breach of contract claim was presented before the Court of Federal Claims in this case, and it is too late to assert it on appeal.

CONCLUSION

We affirm the Court of Federal Claims' denial of the government's motion to dismiss because the statute of limitations did not bar Mola's action. We also affirm the entry of summary judgment in favor of the government as to Mola's takings and breach of contract claims.

AFFIRMED

---

the supervisory designation was required for a thrift to recognize goodwill under the purchase method of accounting.

[9] We need not reach the government's contention that Mola lacks standing to assert a Winstar breach of contract claim because Mola was not a party to any agreement with the government regarding regulatory treatment of goodwill, even if Charter was a party to such a contract.

# United States Court of Appeals for the Federal Circuit

2007-5058, -5080

MOLA DEVELOPMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-790,Judge Mary Ellen Coster Williams.

NEWMAN, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's holding that the complaint of Mola Development Company was filed within the six-year limitations period of the Tucker Act. However, the court errs in ruling that there was no contract between Mola and the federal bank authorities. The arrangement whereby Mola agreed to contribute a total of $3.5 million in cash upon merger with the insolvent Merit Savings Association, and the government agreed to classify this merger as a supervisory case, was fully agreed, recorded, and implemented, in accordance with ordinary contract principles. The extensive written exchanges, along with the agency documentation, produced an integrated contract that is not distinguishable in its premises from the contract in United States v. Winstar Corp., 518 U.S. 839 (1996). The circumstances and documents left no doubt that a contract including supervisory goodwill

purpose of encouraging healthy thrifts to acquire insolvent ones in order to reduce the government's liability to the failing banking industry. The Court of Federal Claims erred in its holding that there was no contract and no liability. I respectfully dissent from my colleagues' affirmance of this decision, on this court's finding that no single document contains all of the contract conditions and the mistaken understanding of the government's approval of the merger as a supervisory case for accounting purposes.

DISCUSSION

As discussed in Winstar, between 1981 and 1983 approximately 435 thrift institutions had failed and the Federal Savings and Loan Insurance Corporation (FSLIC) was exhausting its insurance fund. In this critical situation, the Federal Home Loan Bank Board (FHLBB) encouraged solvent banks and thrift institutions to salvage insolvent thrifts. As the Court explained in Winstar, the government's liability was substantially reduced when insolvent thrifts were enabled to remain in operation, as compared with the cost of federal liquidation. 518 U.S. at 847-48. Thus the government provided substantial incentives, including accounting procedures that achieved paper compliance with capital requirements; these procedures were manifested in the "purchase method" of accounting for liabilities that were designated as "supervisory goodwill," accompanied by long-term amortization and various other concessions and forbearances. The Court remarked particularly on the accounting treatment of supervisory mergers, for

> [T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

518 U.S. at 848. The Court explained that the purchase method of accounting implemented recognition of supervisory goodwill and enabled the merged entity to meet capital requirements:

> Under GAAP there are circumstances in which a business combination may be dealt with by the "purchase method" of accounting. . . . The critical aspect of that method for our purposes is that it permits the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called "goodwill." . . . Goodwill recognized under the purchase method as the result of a FSLIC-sponsored supervisory merger was generally referred to as "supervisory goodwill."

Id. at 849.

FIRREA ended this system, and prohibited the use of supervisory goodwill and long-term amortization to meet capital requirements. Many of the acquired thrifts fell out of compliance, and were seized and liquidated by the government; in Winstar the Court ruled that the enactment and implementation of FIRREA breached the government's contractual obligations incurred in authorizing such acquisitions.

Such a breach occurred here. The contract between Mola and the federal government was an integrated combination of various documents involving the government, Mola and its subsidiary Charter, and the insolvent Merit Savings Association. Mola agreed to contribute approximately $2.5 million in cash to the merged Charter/Merit thrift institution, plus an additional $1 million to Merit's shareholders, and the government agreed to classify the merger as "supervisory." Although the panel majority states that "the FHLBB's approval letter did not mention regulatory treatment of goodwill," maj. op. at 4, the majority's conclusion is inaccurate, for the classification as "supervisory" achieves the regulatory treatment of goodwill. As the record shows, this treatment was essential to

Mola's agreement to acquire the insolvent Merit thrift institution, and essential to the merged institution's compliance with capital requirements.

The contractual arrangement between Mola and the government involved various documents, including Mola's H-(e)3 application, filed on April 19, 1988. The H-(e)3 application included a "Consolidated Charter & Merit Balance Sheet" that listed supervisory goodwill as an asset valued at $10,996,000 as of December 30, 1987. In paragraph (g) of the H-(e)3 application, entitled "Accounting Procedures," Mola stated the condition "to record the acquisition of Merit as a purchase transaction under generally accepted accounting principles . . . and Statement of Financial Accounting Standards No. 72 ('FASB No. 72')." The record shows FASB No. 72 as the Financial Accounting Standards Board standard 72 for "the amortization period of goodwill." Paragraph (g) also states that "identifiable intangible assets acquired" include "FASB No. 72 goodwill." The H-(e)3 application compiled the information that the record showed to be under discussion as the offer from Mola to merge the insolvent Merit into Mola's solvent subsidiary Charter, through a supervisory acquisition. Mola's H-(e)3 application included the purchase method of accounting based on supervisory goodwill and long-term amortization.

The progress of the negotiations was recorded in various government documents, as in Winstar. A FHLB San Francisco (FHLBSF) memorandum dated May 18, 1988, by Supervisory Agent Mr. Paula, records the "goodwill to be carried on the books" of the merged Charter/Merit institution:

> It is important to note that when the total amount of goodwill to be carried on the books of the resulting institution, $10,996,000, is subtracted [from $22,758,000], the capital of the resulting institution falls to $11,762,000 or 2.6 percent of liabilities.

FHLBSF Memo. at 3. A letter dated June 7, 1988 to the FHLBSF Office of General Counsel specifically addressed the question: "Should the Federal Home Loan Bank Board issue a certificate deeming Merit Savings Bank a supervisory case for the purposes of the subject application?" The FHLBSF letter stated that "the applicant has requested that Merit be deemed a supervisory case by the Bank Board and that the subject acquisition be considered as being instituted for supervisory purposes." The FHLBSF letter recommended that "the Secretariat of the Bank Board deem Merit a supervisory case." Letter at 3. The FHLBSF letter also stated that Mola's request for forbearance from the minimum capital requirement would not be approved except for Merit's "Scheduled Items." Id. There followed the FHLB's letter to Mola dated June 24, 1998, stating that Mola's H-(e)3 application was approved subject to these "Scheduled Items."

Approximately a month after the government's approval of the H-(e)3 application, a FHLBSF memorandum dated July 26, 1988, entitled "Charter Savings Bank . . . Negotiations for Application H-(e)3 for the Acquisition of Merit Savings Bank," summarized the circumstances leading to the approval of the merger. This memorandum reported discussions of the merger terms in at least six meetings over the period from May 5, 1988 to May 24, 1988. The memorandum stated that on May 19, 1988 the FHLBB presented six conditions that it required, and that Mola responded on May 20, 1988 during a conference call by modifying the second condition, adding a seventh condition, and accepting the other conditions. The seventh condition was: "The acquisition is being instituted for supervisory purposes." Mola's proposed modification of the second condition was rejected by the FHLBSF on May 23, 1988, and on May 24, 1988 Mola acquiesced in the rejection and accepted condition two in its original form, but insisted on condition seven.

The Bank Board agreed to condition seven, and the FHLBSF memorandum of July 26, 1988 states that on May 24, 1998 the parties reached agreement and that "[t]he Bank Board will provide the necessary certification indicating that this acquisition falls within the requirements of a supervisory case." Mola testified during trial that "[o]n June 24, 1998, [Mola] got the approval letter from the Federal Home Loan Board, and on that same date, the Federal Home Loan Bank Board issued a certificate deeming Merit a supervisory case." The testimony was undisputed.

The merger of Charter and Merit closed on July 29, 1988, with the supervisory goodwill of the merged institution valued at $15,741,000 on the date of the merger. Both Mola and the government included goodwill in the accounting of Charter's regulatory capital, until December 7, 1989, the effective date of FIRREA. Thereafter the merged institution was prohibited from utilizing the purchase method of accounting, and without the goodwill asset the institution was immediately out of capital compliance. Charter was seized and liquidated.

The government's liability for breach of contract on these premises was established by Winstar. Despite this clear precedent, my colleagues now rule that there was no contract, no obligation, and no liability, because no single document contained all of the terms of the transaction. Indeed, that was the Winstar situation, where the Court ruled that the total documentation comprised an integrated contract. The Court described such arrangements as follows:

> [T]he [FHLBB] resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded supervisory goodwill generated by the transactions were not mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties.

Winstar, 518 U.S. at 909. In Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1235 (Fed. Cir. 2005), this court held that even in the absence of a single formal document stating the entire agreement between the institution and the government, the documentary evidence constituted an agreement concerning supervisory goodwill, the court "[a]nalyzing not only the contemporaneous documents but also the circumstances surrounding the transactions[.]" 402 F.3d at 1229. As in Fifth Third Bank, "the evidence demonstrates that in light of the discussions between the Government and the acquiring thrift with regards to protections affecting capital requirements, including supervisory goodwill, the parties agreed that the acquiring thrift was to be given the favorable accounting treatment of supervisory goodwill and amortization." Id. at 1232.

The panel majority appears to mistake the undisputed evidence, for my colleagues state that "Mola here points to no evidence of any negotiations about the regulatory treatment of goodwill that could serve as evidence that the government agreed to a goodwill contract." Maj. op. at 12. This is contrary to the record, and contrary to Winstar precedent. The facts herein differ from those in D & N Bank v. United States, 331 F.3d 1374 (Fed. Cir. 2003), on which the majority relies, for "D & N . . . simply submitted an application for approval of the merger, and the Bank Board accepted it," and this court found that "there was no negotiation between D & N Bank and the Bank Board that resulted in approval of the merger." Id. at 1379. In contrast, Mola's acquisition of Merit incurred multiple rounds of negotiation, with supervisory goodwill as an essential component that was negotiated and agreed. As the Court discussed in Winstar, it was well understood that absent accounting for supervisory goodwill there would be little reason for

a healthy bank to assume the liabilities of an insolvent bank, when such assumption would render it immediately insolvent and in danger of receivership. The Court explained the purposes of supervisory goodwill:

> Supervisory goodwill was attractive to healthy thrifts for at least two reasons. First, thrift regulators let the acquiring institutions count supervisory goodwill toward their reserve requirement under 12 CFR § 563.13 (1981). This treatment was, of course, critical to make the transaction possible in the first place, because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory net worth.

518 U.S. at 850.

The panel majority errs in ruling that the approval of a supervisory merger "does not establish any contract to maintain this treatment of goodwill," maj. op. at 16, for that is what a supervisory merger is about.[1] My colleagues appear to mistake the purchase method of accounting. See, e.g., First Commerce Corp. v. United States, 335 F.3d 1373, 1377 n.1 (Fed. Cir. 2003) ("When the purchase method is used to account for a merger, any excess of the purchase price over the fair value of the thrift's net assets is recorded as goodwill."). Mola's negotiations leading to designation as a "supervisory case" were targeted to this purpose. See Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1362 (Fed. Cir. 2006) ("The thrifts desired to use the 'purchase' method of accounting, under which the newly created thrift could designate the excess of the purchase price over the fair value of

---

1 Expert testimony explaining the role of supervisory goodwill was presented in the Court of Federal Claims by Mr. Minijit Johal, former official of the Federal Home Loan Bank of San Francisco, explaining 12 CFR §563.13(7)(I) & (III) as requiring the "supervisory" designation for the purpose of using the purchase method of accounting, to convert goodwill based on losses into an accounting asset. My colleagues decline to accept this expertise, although the identical principle was explained in Winstar. See maj.op.at 13 n.5.

all acquired assets as an intangible asset called 'supervisory goodwill,' and claim it as an asset for purposes of computing regulatory capital."); Fifth Third Bank, 402 F.3d at 1224 (same). The panel majority's further holding that 12 CFR §563.13, cited supra in Winstar, does not concern the purchase method of accounting is also off the mark, for the accounting use of supervisory goodwill to meet the reserve requirements under 12 CFR §563.13 was "critical to make the transaction possible in the first place." 518 U.S. at 850.

A contract was formed as it was in Winstar. Mola's H-(e)3 application, the negotiations, the issuance of the certificate of "supervisory case," and the various confirming documents, verified the contractual arrangement. See, e.g., Fifth Third Bank, 402 F. 3d at 1235 ("The totality of the evidence and the circumstances demonstrate that the parties intend to and did create contractual obligations which included the utilization of supervisory goodwill as an accounting treatment for capital compliance."); La Van v. United States, 382 F.3d 1340, 1346-47 (Fed. Cir. 2004) (holding that an implied-in-fact contract was established between the government and the acquiring thrift "[a]s evidenced by an internal memorandum, the treatment of goodwill was at the epicenter of the conversion process"); LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1370 (Fed. Cir. 2003) ("These arrangements concerning goodwill [including a Financing Agreement and a Bank Board Resolution] and the infusion of capital from various sources enabled Talman in 1986 to meet the existing capital requirements."); California Fed. Bank v. United States, 245 F.3d 1342, 1347 (Fed. Cir. 2001) (holding that even without an assistance agreement or a supervisory action agreement, the factual records of the case including various correspondence, memoranda and bank board resolutions show intent to contract with the

government for specified treatment of goodwill). The panel majority's criticism that "no document" contains the entire contract does not defeat the formation of a contract. A similar procedure was discussed in Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1050 (Fed. Cir. 2006), where this court affirmed that the acquiring institution made an offer to the government in its H-(e)3 application, and that a contract ensued when the terms were negotiated and accepted. "Whether a bargained-for exchange occurred depends on the surrounding factual circumstances." Hometown Financials, Inc. v. United States, 409 F.3d 1360, 1365 (Fed. Cir. 2005) (affirming the district court's holding that "the correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreement gave rise to a contract which included provisions addressing goodwill").

The record establishes that there was a bargained-for exchange, and that the ensuing contract was breached by the subsequent enactment of FIRREA and the seizure and liquidation of Charter. I must, respectfully, dissent from the court's holding that there was no contract and no breach.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: [signature] Date: 5/13/08

Bill of Costs (File original and three copies with the Clerk within 14 days of Judgment)
Docket No(s): 2007-5058, -5080 Caption: Mola Development Corporation v. United States

The Clerk is requested to tax the following costs against: Mola Development Corporation, Plaintiff-Appellant

| ITEM | Number of Copies | Number of pages | Actual Cost | Allowable Cost | Total Billed | Total Taxed |
|---|---|---|---|---|---|---|
| (1) Docketing Fee (if paid in this court) | | | | | | |
| (2) Table of Designated Materials (original) | | | | | | |
| (3) Table or Compilation of Designated Materials (Copying and Collating) | | | | | | |
| (4) Brief (Original) | | | | | | |
| (5) Brief (Cover and Binding) | | | | | | |
| (6) Brief (Copying and Collating) | | | | | | |
| (7) Appendix (Original-Table of Contents) | | | | | | |
| (8) Appendix (Covers and Binding) | | | | | | |
| (9) Appendix (Copying and Collating) | | | | | | |
| (10) Reply Brief (Original) | | | | | | |
| (11) Reply Brief (Covers and Binding) | | | | | | |
| (12) Reply Brief (Copying and Collating) | | | | | | |
| Other (describe): Stipulated Costs | | | | | 691.76 | 691.76 |
| Grand Totals | | | | | 691.76 | 691.76 |

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: [signature] Date: 5/13/08

City/County of Washington ) District/State of District of Columbia ) SS

5/13/08 S

I, Jeanne Davidson, swear under penalty of perjury that the services for which costs are taxed were necessarily performed. Itemized Statements of the costs incurred or invoices are attached. Copies of this bill were served on all parties. The Certificate of service is attached.

Signature: [signature] Date: 3/6/08 Attorney for: United States Defendant-Appellee

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 10th day of March, 2008, I caused to be sent by facsimile and delivered by first class mail, postage pre-paid, copies of the foregoing "BILL OF COSTS," addressed as follows:

Paul R. Franke, III, Esq.
Franke Greenhouse List & Lippitt LLP
1228 Fifteenth Street, Suite 200
Denver, CO 80202
Tel: (303) 623-8267
Fax: (303) 623-0960

Randall Burrow